# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| IN RE BIG THORNE PROJECT AND 2008 TONGASS FOREST PLAN | Case No. 1:14-cv-0013-RRB (Consolidated with 1:14-cv-0014-RRB and 1:14-cv-0015-RRB)<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS** |

## I. INTRODUCTION

In the consolidated matter before the Court, Southeast Alaska Conservation Council, Alaska Wilderness League, National Audubon Society, Natural Resources Defense Council, Sierra Club, Cascadia Wildlands, Center for Biological Diversity, Greater Southeast Alaska Conservation Community, Greenpeace, and The Boat Company ("Plaintiffs") have challenged timber development in the Tongass National Forest that has been considered and approved by the United States Forest Service.

Plaintiffs claim violations of the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the 2008 Amended Tongass National Forest Land and

Resource Management Plan ("2008 Forest Plan"). Plaintiffs have also challenged the 2008 Forest Plan as failing to comply with NFMA. Prior to consolidation, Plaintiffs filed motions for summary judgment at **Docket 32** (1:14-cv-13), Docket 26 (1:14-cv-14), and Docket 28 (1:14-cv-15). The Defendants United States Forest Service, United States Department of Agriculture, Beth Pendleton, and Forrest Cole, ("USFS") responded at Docket 58 (1:14-cv-13), Docket 64 (1:14-cv-14), and Docket 68 (1:14-cv-15). The Alaska Forest Association, the State of Alaska, the city of Craig, and Viking Lumber, Inc. ("Intervenors") also filed responses in opposition to Plaintiffs' motions for summary judgment at Docket 57 ( 1:14-cv-13), Docket 62 (1:14-cv-14), and Docket 69 (1:14-cv-15). Plaintiffs reply at Docket 68 ( 1:14-cv-13), Docket 68 (1:14-cv-14), and Docket 72 (1:14-cv-15). In their responsive filings, USFS moves for summary judgment.

Plaintiffs also have requested oral argument at Docket 28 (1:14-cv-15) and to strike portions of Intervenors' response in opposition at Docket 66 (1:14-cv-14). Motions for preliminary injunction have also been made by Plaintiffs at Docket 85 (1:14-cv-13) and Docket 78 (1:14-cv-15). As a preliminary matter, the Court grants Plaintiffs' unopposed motion for judicial notice at Docket 70 (1:14-cv-14). Plaintiffs seek declaratory and injunctive relief from USFS, asking the Court to prevent the commencement of timber activities scheduled to begin April 1, 2015.

## II. GOVERNING PROVISIONS

### A. NFMA

The National Forest Management Act ("NFMA") requires the Forest Service to manage the National Forest System through a two-tiered land management process.[1] The first tier calls for "land

---

[1] 16 U.S.C. §§ 1600 et seq.; 16 U.S.C. § 1604(a).

and resource management plans," commonly referred to as forest plans, which define allowed uses in various parts of the forest, establish management goals, and set standards and guidelines for site-specific forest management.[2] Forest Plans must also provide for sustained yield and balance multiple uses: they must coordinate outdoor recreation range, timber, watershed, wildlife and fish, and wilderness uses.[3] After a forest plan is developed, all subsequent agency actions must comply with NFMA and the governing forest plan.[4] The second tier consists of project-level decisions which govern actual on-the-ground actions such as timber sales. Substantively, NFMA requires that forest plans "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area."[5]

## B. NEPA

The National Environmental Policy Act ("NEPA") contains additional procedural requirements to be followed whenever the federal government proposes actions with environmental consequences.[6] Its purpose is to ensure the decision-maker will have detailed information on environmental impacts and provides that information to the public.[7] The Forest Service must prepare

---

[2] 16 U.S.C. § 1604(a), (e), (g); *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003).

[3] 16 U.S.C. § 1604(e).

[4] 16 U.S.C. § 1604(i).

[5] 16 U.S.C. § 1604(g)(3)(B).

[6] 42 U.S.C. §§ 4321 et seq.; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989).

[7] *Ecology Center v. Castaneda*, 574 F.3d 652, 656-57 (9th Cir. 2009) (*citing Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996)).

an Environmental Impact Study (EIS), which identifies environmental effects and alternative courses of action, when undertaking any management project.[8] "'In contrast to NFMA, NEPA exists to ensure a process, not to mandate particular results.'"[9] Under NEPA, the agency need only take a "hard look" at its proposed action.[10] So long as "the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."[11]

However, the EIS "must respond explicitly and directly to conflicting views in order to satisfy NEPA's procedural requirements."[12] When additional or updated information is made available to the agency after the close of the decision-making process, the agency may need to prepare a Supplemental Environmental Impact Statement ("SEIS") in order to address the new information.[13] Although not specifically mentioned in NEPA, agencies may utilize a supplemental information report ("SIR") to evaluate the new information and to evaluate whether it impacts the approved action.[14]

---

[8] *Id.* at 657.

[9] *Id.* (*quoting Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1063 (9th Cir. 2002)).

[10] *Id.* at 1070.

[11] *Robertson*, 490 U.S. at 350.

[12] *Earth Island Institute v. U.S. Forest Service*, 442 F.3d 1147, 1172 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 1829 (2007), *abrogated on other grounds*, *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365 (2008).

[13] 23 C.F.R. § 771.130

[14] *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000)

**C.  TTRA**

The Tongass Timber Reform Act ("TTRA"), which amended portions of the Alaska National Interest Lands Conservation Act ("ANILCA"), provides that the Forest Service is to "seek to provide a supply of timber from the Tongass National Forest that (1) meets the annual market demand for timber from such forest and (2) meets the market demand from such forest for each planning cycle."[15] The Forest Service is still "[s]ubject to appropriations, other applicable law, and the requirements of the [NFMA]" in meeting timber demand and must remain "consistent with providing for the multiple use and sustained yield of all renewable forest resources.[16] At a minimum, the TTRA "requires the Forest Service to at least consider market demand and seek to meet market demand."[17]

### III. FACTUAL BACKGROUND

The Tongass National Forest, established September 10, 1907, covers nearly 17 million acres across southeastern Alaska. Pursuant to the requirements of NFMA, the Forest Service adopted a revision of the Tongass National Forest Land and Resource Management Plan in 1997 ("1997 Forest Plan"). In response to the Ninth Circuit's decision in *Natural Resources Defense Council, et al. v. United States Forest Service, et al.*, the 1997 Forest Plan was subsequently amended through a

---

[15] 16 U.S.C. § 539d(a).

[16] *Id.*

[17] *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 809 (9th Cir. 2005).

Record of Decision ("ROD") issued on January 23, 2008, ("2008 Forest Plan").[18] Relevant to the present matter, two local species are identified within the 2008 Forest Plan as management indicator species ("MIS"): the Sitka black-tailed deer ("deer") and the Alexander Archipelago wolf ("wolf").[19] Using MIS the 2008 Forest Plan requires the Forest Service to "[p]rovide the abundance and distribution of habitat necessary to maintain viable populations of existing native and desirable introduced species well distributed in the planning area."[20]

Located within the northern portion of Prince of Wales Island and encompassing approximately 232,000 acres is the Big Thorne area. On June 28, 2013, USFS, through a ROD signed by the Forest Supervisor, approved the Big Thorne project and provided the relevant FEIS. The Big Thorne Project approved the logging of approximately 6,186 acres of old growth forest and construction of 46.1 miles of new Forest Service roads. Plaintiffs objected to any logging taking place and filed timely administrative appeals of the ROD and FEIS. After review, the Regional Forester affirmed the decision approving the Big Thorne project. However, implementation of the Big Thorne project was halted by the Regional Forester until a SIR was prepared to address concerns raised by Plaintiffs on appeal.[21] Specifically, the SIR was to address the post-ROD statements of Dr. David Person on the detrimental effects of the Big Thorne project on the wolf population.

---

[18] 421 F.3d 797 (9th Cir.2005).

[19] AR 603_1592, at 6-10 (Sitka black-tailed deer); *Id*. at WILD1.XIV (Alexander Archipelago Wolf).

[20] *Id*. at WILD1.II.B.

[21] AR 736_4573.

The Wolf Task Force—comprised of two members from each of the three agencies involved: the Forest Service, the Fish and Wildlife Service, and Alaska Fish and Game—was convened to aid in the review and preparation of the SIR. The task force was ultimately split in its review of the additional information and wolf population impacts. In the absence of a consensus from the task force, the Forest Supervisor issued a Final SIR on August 19, 2014, affirming the approval of the Big Thorne project and the Regional Forester officially concurred with the findings of the Final SIR on August 21, 2014. Viking Lumber Company, Inc. successfully bid on the timber contract under the Big Thorne project on September 30, 2014, and ground disturbing activities are set to commence April 1, 2015, pending the outcome of this litigation.[22]

Any additional facts are well known to the parties and are set forth in detail in the parties' pleadings. In the interest of brevity those additional facts are not repeated here except to the extent it may be necessary to understand the Court's ruling on the pending motions.

## IV. STANDARD OF REVIEW

The Administrative Procedure Act governs this Court's review of the actions of USFS on remand. "'Agency decisions that allegedly violate. . . NEPA and [the] NFMA are reviewed under the Administrative Procedure Act ('APA'), and may be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"[23] This review is to be

---

[22] AR 736_4610.

[23] *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) *(quoting Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1008–09 (9th Cir. 2006), 5 U.S.C. § 706(2)(A)).

"searching and careful," but the arbitrary and capricious standard is narrow.[24] This Court cannot substitute its own judgment for that of the agency.[25] An agency's decision is arbitrary and capricious if it fails to consider important aspects of the issue before it, if it supports its decisions with explanations contrary to the evidence, or if its decision is either inherently implausible or contrary to governing law.[26]

## V. DISCUSSION

Plaintiffs have brought both site-specific challenges to the Big Thorne timber project as well as a substantive challenge to the governing 2008 Forest Plan. The Court must first decide whether the project was in compliance with the plan in effect at the time of the site-specific decision in order for the forest plan challenge to be ripe.[27] The Court therefore first addresses Plaintiffs' challenges to the Big Thorne project, followed by their challenges to the 2008 Forest Plan.

### A. Big Thorne Project

Plaintiffs challenge USFS's actions at nearly every phase of the Big Thorne project. The following are those challenges and arguments by Plaintiffs that the Court finds to be the most meritorious in addressing the consolidated motions for summary judgment.[28]

---

[24] *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1061 (9th Cir. 2014) (*quoting Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005)).

[25] *Id.*

[26] *Id.* (*quoting The Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005)).

[27] *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011).

[28] Any other arguments not referenced herein should be considered to be found to be without merit by the Court.

First, Plaintiffs challenge the reasoning for USFS to consider the Big Thorne project (Market Demand). Second, Plaintiffs challenge the completeness of the information considered by USFS in coming to the decision to approve the Big Thorne project (Current Wolf Population Estimates). Third, Plaintiffs challenge the explanation given by USFS supporting the decision to approve the Big Thorne project (Sustainable Wolf Population under Big Thorne). Fourth, Plaintiffs assert that the decision-making process leading to the approval of the Big Thorne project was incomplete (Disclosure of Impacts to Wolves). Finally, Plaintiffs challenge USFS's treatment of additional input after the approval decision was made (Necessity of a SEIS).

### 1.    Market Demand

Plaintiffs argue that USFS acted arbitrarily when it relied upon outdated projections of timber demand in evaluating the need and scope of the Big Thorne project. Plaintiffs argue that the failure to conduct any "reality check" on the projections constituted an arbitrary act by USFS. The projections in question stem from the Brackley Report (2006) and its 2008 addendum, which were prepared by economists for USFS.[29] The report evaluates demand in all markets—foreign and domestic—and the amount of timber volume required to produce the products the market would utilize.[30] The problem, according to Plaintiffs, is that the report predates the collapse of the home mortgage and housing markets beginning in 2008, which has had a negative impact on the markets for Alaska timber, and the projections are significantly larger than recent harvest levels.

---

[29] AR 736_1628; AR 736_1629; AR 736_2244, at 678–79.

[30] AR 603_1592, App. G, at G-6–G-7.

USFS points out that the Brackley Report was not a short term report, as it analyzed trends over forty years—from 1965 to 2004—for three key parameters to project demand for a twenty-year period from 2005 to 2025.[31] Additionally, market demand is not the only constraint on actual harvest level in the Tongass in recent years. Policy, funding, and litigation—as the Court is acutely aware—have all had an impact on harvest levels. There is no indication that USFS ignored the 2008 market crash, and in fact the record indicates that USFS addressed the current market and found that domestic housings lumber needs "were on the rise" and demand for Alaskan timber was "expected to increase."[32]

Plaintiffs also challenge USFS's use of the Morse methodology to determine the timber to be offered and the volume under contract. Experts for USFS utilized the Morse methodology, which takes the timber market demand from the Brackley report, to determine volume of timber to offer for sale in a given year, to set the annual amount of timber to be offered and the volume under contract goal.[33] It was the opinion of USFS experts that the best way to arrive at a long-term volume under contract goal was using the Morse methodology to convert projected market demand.[34]

While Plaintiffs may disagree with the use of the Morse methodology, preferring an express reliance on projected harvests, that does not mean that USFS has erred. If USFS intends for the projected "harvest" to meet market demand, it is not unreasonable for USFS to use a methodology

---

[31] *Id*. at G-4; Brackley Report (2006), AR 736_1628, at 25.

[32] AR 736_4007 at 25.

[33] AR 736_2244 at 681.

[34] *Id.* at 681-82.

that factors projected demand in order to determine the proper amount to offer and to place under contract.

Ultimately, USFS "has recognized expertise and discretion in predicting timber demand."[35] This includes both reliance on the Brackley report generally, as well as USFS's use of the "Expanded Lumber" scenario.[36] Although there are differing expert opinions, Plaintiffs have not shown USFS' reliance on the expert report, methodology, and ultimate calculations of market demand was unreasonable. The Court, in its review, is only to ensure that the USFS's decision was a reasonable one, "not the best or most reasonable, decision."[37] **Accordingly, the Court finds that USFS's assessment of the timber market demand, including reliance on the Brackley Report and the Morse methodology, was reasonable and does not render the decision approving the Big Thorne project to be arbitrary and capricious.**

## 2. Current Wolf Population Estimates (NEPA)

Plaintiffs assert that the Big Thorne FEIS failed to comply with the requirements of NEPA by omitting consideration of wolf population information from USFS's analysis. USFS argues that the wolf population information was simply not included because it was not essential to the decision-making process, and therefore not required.

There is no question that when evaluating reasonably foreseeable significant adverse effects in an EIS, an agency must not only indicate unavailability or incompleteness of related information,

---

[35] *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 746 F.3d 970, 978 (9th Cir. 2014).

[36] AR 736_2244 at 679.

[37] *National Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

but also must obtain and include that incomplete information if it "is essential to a reasoned choice among alternatives."[38] USFS expressly acknowledged not only the incompleteness of information on wildlife populations generally, but also that the information presently available was sufficient for a reasoned choice between the alternatives and disclosure of possible adverse environmental consequences.[39] Incomplete knowledge of the wolf population was specifically noted and the FEIS stated that the effects of the Big Throne project are within the range of effects projected after full implementation of the 2008 Forest Plan.[40]

Plaintiffs argue that a current wolf population estimate for the area was designated as a "critical need" by USFS in the Big Thorne SIR.[41] However, this indication was with regard to the development of a Wolf Habitat Management Plan under the 2008 Forest Plan, not the Big Thorne project.[42] While beneficial, a Wolf Habitat Management Plan is not required by NEPA, NFMA, or even the 2008 Forest Plan prior to a site-specific project.[43]

Additionally, the Wolf Task Force conclusions do not undermine USFS's determination that current wolf population estimate was not essential. While part of the Wolf Task Force felt that there was a need for additional information, it only recommended USFS consider actions to reduce the

---

[38] 40 C.F.R. § 1502.22.

[39] AR 736_2244 at 84.

[40] *Id*. at 183-84.

[41] AR 736_4559 at 9;

[42] AR 603_1593 at 4-95.

[43] *See Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 496-99 (9th Cir. 2014).

risk until that information was available.[44] Moreover, the Court must uphold an agency's reasonable decision "even if the administrative record contains evidence for and against its decision."[45] Differing opinions from individuals in sister agencies or even from within the agency do not require deference from USFS in reaching its final determination, nor do they change the Court's review of the final action. USFS fully considered the various viewpoints from the task force and the draft SIR before reaching its final decision.[46]

USFS not only identified the incomplete and missing current wolf population estimates, but also provided explanation as to why that information was not considered essential to a reasoned choice among the alternatives in the Big Thorne FEIS. USFS has met the regulatory requirements for incomplete information. **Therefore, the Court finds that USFS did not violate section 1502.22 of NEPA.**

### 3. Sustainable Wolf Population under Big Thorne (NFMA)

Plaintiffs also argue that USFS violated NFMA by providing an arbitrary explanation on how Big Thorne is consistent with the 2008 Forest Plan. Specifically, Plaintiffs challenge how the approval of the Big Thorne project can still provide enough deer habitat to support a sustainable wolf population, i.e. one that does not decline.[47]

---

[44] AR 736_4244 at 14.

[45] *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quotation omitted).

[46] AR 736_4559 at 6-11, 15-26.

[47] *See infra* Part V.B.2.

Under the NFMA, USFS must demonstrate that a site-specific project will be consistent with the Forest Plan.[48] The 2008 Forest Plan utilizes the interagency deer habitat capability model ("deer model") to evaluate the relative differences between project alternatives that may affect deer habitat capability at the scale of the WAA ("Wildlife Analysis Area") or of groups of WAAs, or even forest-wide.[49]

The 2008 Forest Plan calls for the implementation of a "Forest-wide program," in cooperation with ADF&G and USFWS, to assist in maintaining long-term sustainable wolf populations.[50] The forest-wide Standard and Guideline WILD1.XIV.A is the provision which addresses sustainability of wolf populations.[51] USFS is to "[p]rovide, **where possible**, sufficient deer habitat capability to first maintain sustainable wolf populations, and then to consider meeting estimated human deer harvest demands."[52] The provision also notes that "[t]his is generally considered to equate to the habitat capability to support 18 deer per square mile . . . where deer are the primary prey of wolves."[53]

While Plaintiffs assert that any action under the 2008 Forest Plan must preserve a deer habitat capability of 18 deer per square mile in each WAA, that is simply not required by either

---

[48] 16 U.S.C. § 1604(i); *Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2010)(en banc).

[49] AR 736_4587, at 1; 2008 Forest Plan FEIS, AR 603_1591, at 3-232.

[50] AR 736_0002 at 258 (Standard and Guideline WILD1.XIV.A).

[51] *Id.*

[52] *Id.* (emphasis added).

[53] *Id.*

NFMA or the 2008 Forest Plan. To understand this, it is important to draw distinction, as USFS did in the Big Thorne FEIS, between wolf population *viability* and *sustainability*. The required provision for wolf population, under NFMA and the 2008 Forest Plan, is *viability* of the wolf population, i.e. sufficient numbers to avoid extinction.[54] USFS explained in the Big Thorne FEIS that to maintain viable wolf populations under the Forest Plan, per the recommendation of a dedicated committee, a deer density of at least five deer per mile squared must be maintained in areas where deer are the wolves' primary prey.[55] USFS enunciated that wolf population *viability* has a high likelihood of being maintained under implementation of the Big Thorne project and Plaintiffs have not disputed this, challenging instead wolf population *sustainability*.[56] Again, sustainability involves maintaining the population at a given level, while viability involves maintaining the population at such a level that it does not become extinct.

Wolf population sustainability is only provided for in Standard and Guideline WILD1.XIV.A.2, as discussed above. However, the standard and guideline in paragraph A.2 provides for flexibility and discretion. In providing deer habitat capability, USFS is to first look at whether it is *possible* to provide for sufficient deer habitat capability to maintain sustainable wolf populations.[57] Then USFS is to *consider* providing enough deer habitat capability to meet human

---

[54] *See* 16 U.S.C. § 1604(g)(3)(B); AR 603_1593 at 4-89 (2008 Forest Plan). *See infra* Part V.B.2.

[55] AR 736_2244 at 835. Plaintiffs have disputed USFS's use of this metric for wolf viability in their challenge to the 2008 Forest Plan. *See infra* Part V.B.2.

[56] *Id.* at 849.

[57] AR736_0002 at 258.

harvest needs.[58] Additionally, the habitat capability to support 18 deer per square mile represents the required density to meet *both* sustainable wolf populations and all human harvest needs.

Based on the plain language of the 2008 Forest Plan, the deer habitat capability provision is a guideline to ensure consideration and evaluation of deer habitat needs in USFS's exercise of discretion, not a bare minimum deer density requirement for all agency actions. This interpretation comports with USFS's duty to balance conflicting objectives in pursuing its multiple-use mandate under NFMA and the 2008 Forest Plan.[59]

In the Big Thorne FEIS, USFS explained that timber volume from the Tongass National Forest is being offered under this project to fulfill the multiple-use mission of the Forest Service under NFMA and TTRA.[60] USFS also repeatedly stated that *none* of the project area WAAs presently support 18 deer per square mile, nor would they achieve this even under the no-action alternative."[61] However, USFS did note that not only had it considered the impacts on wolf population, but that "WAAs in the project area are within the percentage change to deer habitat capability disclosed by the 2008 Forest Plan FEIS with full implementation of the Plan" and that "this was a consideration in determining viability at the scale of the Forest."[62] USFS also made a

---

[58] *Id.*

[59] *See Tongass Conservation Soc. v. U.S. Forest Service*, 385 Fed. Appx. 708, 711 (C.A.9 (Alaska), 2010)("[T]he Forest Service's approval of a project that would result in less than eighteen deer per square mile was reasonable in light of the conflicting objectives of the Forest Plan"); *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 900 (9th Cir.2002).

[60] AR 736_2244 at 676.

[61] *Id.* at 184, 246, 250, 251, 260, 836, 839, 850. 862.

[62] AR 736_2244 at 836.

clear distinction between the implication of the Big Thorne project on both the sustainability and

viability of wolf population.[63] With regard to the projects impact on wolves, USFS also noted that

it considered the large adjacent reserve areas as well as input from "experts with local knowledge,"

clearly indicating reliance on more than just deer modeling in coming to its final decision.[64]

       The Court finds sufficient basis to support USFS's explanation and approval of the Big

Throne project. USFS considered the ability to provide sufficient deer habitat to meet both the

viability and sustainability of wolf populations, and where that sustainability was not presently

possible, USFS appropriately exercised its discretion.

### 4.       Disclosure of Impacts to Wolves (NEPA)

       Plaintiffs argue that USFS failed to fully and fairly disclose and analyze the potential adverse

consequences of the Big Thorne project on wolf populations in violation of NEPA. In particular,

they allege that the FEIS did not respond explicitly to Dr. Person's dissenting scientific opinion and

did not adequately address concerns or disclose the effects of the projects impacts to wolf

population.

       NEPA requires that the agency make every effort to disclose and discuss in the draft EIS all

major points of view on the environmental impacts of the alternatives, including the proposed

action.[65] Then in the FEIS, the agency must respond to all comments and discuss "any responsible

---

[63] *Id.* at 729.

[64] *Id.* at 849. The Court does not find that USFS was justifying lower deer habitat capability areas within the Big Thorne project by relying on adjacent old growth reserve areas, but rather reinforcing the forest-wide scope of the standard and guideline along with the mobile nature of the wolf population.

[65] 40 C.F.R. § 1502.9(a).

opposing view which was not adequately disclosed in the draft [EIS] and shall indicate the agency's response to the issues raised."[66] However, NEPA does not "require the Forest Service to affirmatively present every uncertainty in its EIS."[67]

The Court finds that USFS did address those statements and differing opinions expressed by Dr. Person during the decision-making process, with the exception of those statements made *after* the FEIS and ROD were issued.[68] But even in that case, the Regional Forester halted implementation of the Big Thorne project until Dr. Person's concerns could be evaluated by the Wolf Task Force and their report could be evaluated in the SIR.[69] USFS argues that although "Dr. Person obviously disagrees with the Forest Service's rationale for approving the Big Thorne Project. . . .that disagreement does not invalidate the Forest Service's decision or suggest the Agency simply ignored Dr. Person's views, much less establish a NEPA violation." The Court agrees.[70]

The Court is also unpersuaded by Plaintiffs' assertion that USFS failed to address the consequences of the Big Thorne project's impacts to the wolf population. The FEIS has numerous references and discussions on the projects impacts to the wolf population, including direct and indirect impacts such as loss of potential denning sites, pack dispersal and increased susceptibility

---

[66] *Id*. § 1502.9(b).

[67] *McNair*, 537 F.3d at 1001.

[68] *See* AR 736_2244, at 656.

[69] AR 736_4244, at 14

[70] *See Native Ecosys. Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012).

to trapping.[71] The FEIS also explained that the Project's authorization of road densities slightly higher than those that now exist would not be likely to substantially increase wolf harvest.[72] **The Court finds that USFS did sufficiently, and in a reasonable manner, disclose and address the impacts to the wolf population and therefore did not violate NEPA.**

### 5. Necessity of a Supplemental Environmental Impact Statement

Plaintiffs' last area of challenge to the Big Thorne project is in USFS's treatment of additional information received after the FEIS and ROD were issued. In particular, Plaintiffs argue that a SEIS, in addition to or in place of a SIR, was necessary to address the issues raised by Dr. Person's August 15, 2013, statement.[73] USFS maintains that the information was not significant and therefore a SIR was the only necessary and appropriate action.

A SIR has a very narrow and specific purpose of answering the question of whether new information or circumstances are significant. If the result of the SIR is a finding of significance, no matter the scale, then any further analysis of that information must comply with NEPA procedures and a Supplemental EIS must be prepared.[74] The use of a SIR by USFS to evaluate Dr. Person's 2013 statement was appropriate to determine if this new information—which included some of his old concerns as well—was significant.

---

[71] AR 736_2244 at 850.

[72] *Id*. at 261.

[73] AR 736_4529

[74] *See* 40 C.F.R. § 1502.9(c)(4); FSH 1909.15, § 18; *Idaho Sporting Cong. Inc.*, 222 F.3d at 566.

In reviewing an agency's decision not to prepare an SEIS, the Court must review the records only to ensure that the agency has made a "reasoned decision based on its evaluation of the significance—or lack of significance—of the new information."[75] The record reflects that USFS did not disregard or easily dismiss Dr. Person's statement.[76] On the contrary, project implementation was placed on hold and a task force was convened to thoroughly evaluate the information he raised. The Wolf Task Force acknowledged the concerns raised by Dr. Person, but ultimately concluded that the complex interactions at play in the project area "were evaluated in the USFS EIS and Record of Decision."[77] Ultimately, USFS utilized a task force and SIR to take a hard look at Dr. Person's statement and determined that the new impacts he suggested were not significantly different from those already considered, which kept USFS fully compliant with NEPA.[78] **The Court finds that USFS's use of the SIR and determination of no significant new information was appropriate. A SEIS was therefore not required and USFS did not violate NEPA.**

## B. The 2008 Forest Plan

Because a Forest Plan itself "does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut," a challenge to a Forest Plan is not ripe unless brought in the context of a site-specific implementation of that plan.[79] As the Court has found

---

[75] *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 372-75 (1989).

[76] AR 736_4559; AR 736_4563; AR 736_4571.

[77] AR 736_4244, at 14

[78] *N. Idaho Cmty. Action Network v. U.S. DOT*, 545 F.3d 1147 (9th Cir. 2008); *see also Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 374 (1989).

[79] *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998) *accord Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 925-926 (9th Cir. 1999).

that the Big Thorne project did not violate NEPA, NFMA, or the 2008 Forest Plan, the Court can now move to address Plaintiffs' challenge to the 2008 Forest Plan.

As an initial matter, the Court finds that the adoptions of the 2008 Forest Plan, and its accompanying FEIS, constitute final agency action that the Court has jurisdiction to review.[80] Additionally, the Plaintiffs have standing to challenge that action, and their claims are now ripe.[81]

Plaintiffs challenge the 2008 Forest Plan for violations of both NEPA and NFMA related to impacts to sustainable wolf populations. First, Plaintiffs allege that the 2008 Forest Plan FEIS violated NEPA by providing insufficient discussion of adverse environmental effects, failing to acknowledge the environmental consequences of logging exclusively in wolf habitat, and failing to explain how wolf viability can be maintained with no obligation to maintain sustainable wolf population. Second, Plaintiffs assert that the approval of the 2008 Forest Plan violates NFMA because the record indicated deer habitat already below the threshold for sustainable wolf populations and the Forest Plan provides no enforceable standard for deer habitat or road density to maintain a viable wolf population.

### 1.    Challenges under NEPA

In reviewing the 2008 Forest Plan FEIS, the Court's role is only to ask whether the FEIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences" and to ensure that both USFS and the public have the information reasonably

---

[80] *Bennett v. Spear*, 520 U.S. 154 (1997); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1516 (9th Cir. 1992)

[81] *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998); *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 816 (9th Cir. 2005); *Sierra Forest Legacy*, 646 F.3d at 1161.

necessary to evaluate the alternatives being considered.[82] The Court finds that the 2008 Forest Plan FEIS did provide sufficient discussion of the impact and effects to the wolf population, including the effects of timber harvest and addressing the cumulative impacts.[83] Additionally, USFS also provided sufficient information and reasonable discussion regarding wolf population viability under the 2008 Forest Plan and was not required to explain how the 2008 Forest Plan would provide for sustainable wolf populations which was not a required agency standard or statutory mandate. **The Court finds that the 2008 Forest Plan FEIS discussion was "reasonably thorough" and took the requisite hard look at the environmental consequence consistent with the requirements of NEPA.**

       2.      Challenges under NFMA

Although restyled and reframed in a variety of ways by Plaintiffs, the challenge to the 2008 Forest Plan under NFMA, and to an extent NEPA as well, is at its core a dispute over the difference between *viable* wolf populations and *sustainable* wolf populations. Plaintiffs repeatedly draw an incorrect connection between the statutory obligation to preserve a *viable* wolf population and the deer habitat capability necessary for a *sustainable* wolf population. As the Court has alluded to earlier in discussing the Big Thorne project, the meaning of a *viable* population and a *sustainable* population are distinct and not interchangeable.[84]

---

[82] *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206–07 (9th Cir. 2004); *see also Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004).

[83] AR 603_1591 at 3-236 to 3-238, 3-281 to 3-285. *Natural Res. Def. Council*, 421 F.3d at 813.

[84] *See supra* Part V.A.3.

A viable population is defined as having "the estimated numbers and distribution of reproductive individuals to insure its continued existence."[85] Although not specifically defined within the 2008 Forest Plan or NFMA, a sustainable population is one "capable of being maintained or continued at a certain rate or level," or "able to last or continue for a long time."[86] While a sustainable population indicates a wolf population that will not decrease into the future, a viable population is only one that will not meet with extinction. It is entirely possible for an action to maintain enough deer habitat capability to preserve the wolf population's existence, but still result in a decline in the population. While the deer habitat capability level necessary for a *sustainable* wolf population would also maintain *viability*, this is simply not a statutory or agency requirement.

As the Court has noted, NFMA requires that the Tongass National Forest "be managed to maintain viable populations of existing native and desired non-native vertebrate species."[87] A viable population does require enough distributed habitat to support "a minimum number of reproductive individuals," but there is no affirmative requirement for the agency to establish a precise standard at the forest plan level of what size or density of population constitutes that minimum for viability.[88] In other words, NFMA is clear in the threshold requirement of a viable population, but allows

---

[85] 36 C.F.R. § 219.19 (2000).

[86] Oxford English Dictionary Online, Oxford University Press, http://www.oed.com (Mar. 2015); Merriam-Webster Online Dictionary, Merriam–Webster, Inc., http://www.merriam-webster.com (Mar. 2015).

[87] 36 C.F.R. § 219.19 (2000); *see also* 16 U.S.C. § 1604(g)(3)(B).

[88] At the project level, USFS was able to respond to challenges to viability of the wolf population, identifying a minimum deer habitat capability necessary for viability in the project area—five deer per square mile—based on recommendations from its experts. AR 736_2244 at 729, 835.

flexibility to the agency in determining what a viable population looks like. The "inherent flexibility of the NFMA" comports with the challenging balance USFS must maintain in achieving its required multiple-use goals of recreation, environmental protection, and timber harvest.[89]

In seeking to meet the minimum requirement of viability, the 2008 Forest Plan actually maintains a heightened goal for wolf population: sustainability. Rather than set a minimum floor for the wolf population, the deer habitat capability provision in WILD1.XIV.A.2 sets the high mark for the deer habitat capability USFS wants to meet the needs of wolves and humans alike. The addition of the qualifier "where possible" and inclusion of factors beyond modeling, act to put the plain language of the 2008 Forest Plan in line with the overarching spirit of NFMA. Under the 2008 Forest Plan, the Standard and Guideline WILD1.XIV.A no longer binds USFS to a heightened standard for deer density—that was unattainable, conflicted with competing objectives, and beyond the statutory requirement—but still preserved the agency's aspirations for future wolf population.

It is clear that Plaintiffs desire the 2008 Forest Plan to include an explicit value for the minimum deer habitat capability necessary to support *viability* of wolf populations, as well as a numerical value for road density. Indeed, the Court agrees that fixed metrics throughout USFS's wolf conservation strategy would make future challenges based to timber decisions which impact wolf populations—and their review by the courts—simpler. However, Plaintiffs have not pointed to any specific statutory requirement for such an explicit minimum threshold, nor does this Court find there to be any. This is because "NFMA does not 'specify precisely how' the Forest Service

---

[89] *Earth Island Inst. v. Carlton*, 626 F.3d 462, 470 (9th Cir. 2010) (*quoting McNair*, 537 F.3d 981 at 993-94); *Natural Res. Def. Council*, 421 F.3d 797, 809 & n.22.

must demonstrate that it has met the objectives of the pertinent forest plan.[90] Again, this is congruent with the sort of flexibility necessary to balance the objectives of NFMA.

The Court does not, however, intend for this flexibility to be construed as unenforceability. Agency actions under the 2008 Forest Plan are still subject to evaluation for their impact on wolf population viability and compliance with USFS's wolf conservation strategy, which do set limits on just how flexible the agency can be. However, in the present case the challenge was for the failure to meet a flexible guideline rather than a statutory requirement.[91] **Accordingly, the Court finds that the 2008 Forest Plan does not violate NFMA.**

## VI. CONCLUSION

For the reasons outlined above and the reasons set forth in USFS's pleadings, Plaintiffs' Motions for Summary Judgment at **Docket 32** (1:14-cv-13), **Docket 26** (1:14-cv-14), and **Docket 28** (1:14-cv-15) are hereby **DENIED** and summary judgment is **GRANTED** in favor of Defendants Accordingly, Plaintiffs' Request for Oral Argument, the Motion to Strike at **Docket 66** (1:14-cv-14), the Motion for Preliminary Injunction at **Docket 72** (1:14-cv-13), and the Motion for Preliminary Injunction at **Docket 78** (1:14-cv-15) are all hereby **DENIED** as moot. This matter is hereby **DISMISSED** in its entirety.

**IT IS SO ORDERED** this 20th day of March, 2015.

S/RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE

---

[90] *Earth Island Inst*., 626 F.3d at 470 (*quoting McNair*, 537 F.3d at 992).

[91] *McNair*, 537 F.3d at 994.